

**FILED**

SEP 3 0 2014

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| MARGARET E. ROGERS, | * | CIV 13-3025-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | AFFIRMING DECISION |
| CAROLYN W. COLVIN, | * | OF COMMISSIONER |
| Acting Commissioner of Social Security, | * | |
| | * | |
| Defendant. | * | |

Plaintiff Margaret E. Rogers seeks review of the denial by the Commissioner of Social Security (the Commissioner) of her claim for social security disability insurance (SSDI) under Title II of the Social Security Act (the Act), 42 U.S.C. § 423, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1382. Docs. 1, 14. The Commissioner argues for affirming the denial of benefits. Doc. 16. For the reasons set forth herein, this Court affirms the Commissioner's decision.

## I.   PROCEDURAL HISTORY

Rogers applied for SSI and SSDI on November 18, 2010, alleging disability since July 1, 2010. AR[1] 10, 150, 211–24, 257, 259. The Social Security Administration (SSA) denied Rogers's application on initial review and on reconsideration. AR 150–53, 160–62. Rogers subsequently requested an administrative hearing and appeared with attorney John A. Hamilton[2] before

---

[1] This Opinion and Order uses "AR" to refer to the administrative record followed by the relevant page number therein.

[2] John A. Hamilton is the Legal Affairs Director of South Dakota Advocacy Services (SDAS). AR 379. Rogers entered into a Representation Agreement with SDAS and Hamilton early in 2012. AR 198–204. Hamilton's work on behalf of Rogers has been excellent. Rogers's claim is a close

Administrative Law Judge Robert Maxwell (ALJ) on April 12, 2012. AR 166–67, 181, 198–204. Thereafter, the ALJ issued an unfavorable decision finding that Rogers had the residual functional capacity to perform "seated-light exertional level work" with various exceptions. AR 15. The ALJ denied Rogers's claims, concluding that she was not disabled and was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 23. Rogers timely appealed the ALJ's decision and requested review by the Appeals Council. AR 30, 35, 334–79. After the Appeals Council denied review, AR 1–6, Rogers commenced this action seeking judicial review of the Commissioner's denial of her claim for SSI and SSDI. Doc. 1.

## II.    FACTUAL BACKGROUND

### A.    Rogers's Background and Work

Rogers was born in July of 1963. AR 211. At the time of her administrative hearing, Rogers was 48 years old. AR 50. Rogers completed the eleventh grade and later received her GED. Id. Rogers worked part-time for the United States Postal Service in Parmelee, South Dakota, from at least January 2000 to February 2008.[3] AR 61–62, 229–30, 284. Rogers then worked in Rapid City, South Dakota, first as a cashier at the SuperPumper from March 2008 to September 2008, and then as a front desk clerk at the Super 8 Motel from May 2008 to July 2008. AR 276, 284. In September

---

one to decide in large measure due to Hamilton's arguments and briefing.   Unlike the Commissioner's briefing that took liberties with the Administrative Record at times, Hamilton's briefing zealously yet fairly presented the facts in the light most favorable to Rogers. Unfortunately for Rogers, much of what was in the Administrative Record from before Hamilton's involvement, starting in early 2012, undercuts her claim and provides substantial evidence on the record as a whole to affirm.

[3]Rogers testified that she was employed part-time with the United States Postal Service for fourteen years, AR 61–62, but her earnings report and function report only account for eight years of employment, AR 229–30, 284.

2008, Rogers began working as a laundry attendant at Kings Inn Hotel in Pierre, South Dakota, where she loaded washers and dryers and folded clean laundry for seven to eight hours per day, five to six days per week, until February 2009. AR 276, 283.

Rogers next worked as a cashier at Fresh Start Checkers in Pierre from April 2009 to May 2009, where she waited on customers, operated the cash register, and cleaned the interior premises for six to seven hours per day, five days per week. AR 276, 282. From August 2009 to October 2010, Rogers worked at the Ft. Pierre Motel in Fort Pierre as a housekeeper for three to four hours per day, five days per week. AR 276, 281. Rogers then worked as a casino attendant at Happy Jack's Casino in Pierre seven hours per day, five days a week, where she waited on customers and filled out end-of-the-day accounting sheets for seven hours per day, five days per week. AR 276, 280. During a portion of that time, from approximately June 2010 to September 2010, Rogers also handled cleaning tasks at the Pierre Humane Society for two hours per day, two days per week. AR 276, 279. Rogers left the job at Happy Jack's Casino because her work hours were being cut, AR 57, and stopped working at the Humane Society because she was no longer needed there. AR 253.

In September 2010, Rogers began working as a cashier at Loopy's Dollar Store in Pierre, where she priced items, assisted customers, operated the cash register, and inflated balloons. AR 51, 276, 278. At Loopy's Dollar Store, Rogers worked thirty hours per week, five days per week, but her work days were spread out so that she could rest after working two or three days in a row. AR 55. Rogers had been working at Loopy's Dollar Store for approximately two months when she filed her initial applications for SSI and SSDI in November of 2010, which in turn alleged disability since July 1, 2010, which was when Rogers was working at both Happy Jack's Casino and the Pierre Humane Society. AR 10, 150, 211–24, 257, 259, 276–280.

3

Rogers continued to work less than full time but typically around thirty hours per week at Loopy's Dollar Store until February of 2012, when the store closed. AR 51–52. Rogers testified that she missed some work, sometimes taking an entire day off, and other times leaving work early due to her pain and fatigue. AR 52. Rogers testified that her work activities at Loopy's Dollar Store were limited. For example, she could not pick up or move boxes, AR 53; she could not use a pricing gun for more than forty-five minutes without her arm hurting and losing the ability to squeeze, AR 52–53; she could not stock shelves because her knee prevented her from using a ladder or step stool, AR 54; and she could not stand or sit for extended periods of time, AR 54. Rogers further testified that her pain and fatigue got worse from the beginning to the end of a shift, and that she would feel exhausted when she got home from work, oftentimes having to sleep for a couple hours. AR 55–56. Rogers testified that she would not be able to do a job like the one she had at Loopy's Dollar Store on a full-time basis. AR 56.

On May 13, 2011, Judy Weldin, Rogers's supervisor at Loopy's Dollar Store, completed a Job Performance Questionnaire regarding Rogers's work abilities. AR 300–03. Weldin at that time wrote that Rogers needed to sit every fifteen minutes when working and was limited in working at a consistent pace because of pain. AR 302. Weldin, in that questionnaire, however, described Rogers as "very productive" in her ability to meet quality and production standards and as an employee who would work easily on her own and always found work to do. AR 302–03. After Loopy's Dollar Store closed and after Rogers obtained counsel in 2012, Weldin completed a more detailed Job Performance Questionnaire concerning Rogers, describing that Rogers's job performance had worsened, that Rogers had become slower in her work, and that Rogers had been working with difficulty due to experiencing much pain. AR 326–31.

4

Rogers looked for other jobs after Loopy's Dollar Store closed, but none of her applications resulted in her being hired, leaving her to believe that nobody was hiring in Pierre at the time. AR 62–63. Rogers's earnings have not surpassed $12,000.00 in any year since 2008, AR 82, 228, and her jobs in the above time-frame paid wages at or near minimum wage pay, AR 278–83. At the time of the administrative hearing, Rogers was no longer working in any capacity.

### B.     Rogers's Claims and Medical History[4]

In her initial applications for SSI and SSDI benefits, Rogers claimed disability due to chronic back pain and sleep apnea. AR 150, 259. In her appeal, Rogers cited as additional conditions a knee injury and the presence of constant pain in her right hip, leg, and back, with an onset date of approximately February 1, 2011. AR 285. During the administrative hearing, Rogers testified about having sleep apnea, issues with her knee, degenerative osteoarthritis in her neck and spine, pain down her right leg, and carpal tunnel in both wrists. AR 63–64. As is relevant to this case,[5] medical records indicate that Rogers has a history of degenerative disc disease in her low back, with radiating pain in her legs, a right knee injury, carpal tunnel bilaterally, sleep apnea, daytime somnolence, occasional neck pain, tobacco dependence, and weight problems. AR 380–85, 402–03, 438, 444, 451, 471, 477–80, 484–85, 508–10, 515, 519, 523, 536, 570–71, 580, 582, 626, 629, 641, 643–44. At least some of these conditions predate the medical records within the Administrative Record.

The earliest mention in the Administrative Record of Rogers's back issues is from Rosebud Indian Health Services (Rosebud IHS) records of October 3, 2002, when Rogers saw a physical

---

[4]This section details Rogers's medical history in a more-or-less chronological sequence, but at times departs from a strict chronological order to exhaust all the treatment of certain conditions.

[5]Rogers's medical records include treatment of various other medical conditions that were not unusual and were resolved.

therapist for back and neck pain that had "worsened last month." AR 644. That record referred to Rogers's having experienced low back pain for the last three years without an injury known and with tingling down her left leg particularly when sitting. AR 644. Rogers underwent a course of physical therapy at Rosebud IHS for the low back condition with visits on November 8, November 15, November 21, November 26, December 9, and December 12 of 2002. AR 641–44.

In 2006, Rogers had a recurrence of back pain caused by moving a four-foot square of plywood. AR 380–83. Dr. Christina J. Cote, on May 3, 2006, evaluated Rogers at Winner Regional Healthcare Center. An x-ray taken at the time found no compression fractures or definite subluxation, good overall alignment of lumbar vertebrae, disc spaces fairly well maintained, but some paraspinal calcifications at around the L-1 level. AR 383–84.

In January of 2007, Rogers was seen at Rosebud IHS for a complaint of abdominal pain from lifting heavy boxes, but the record mentioned her history of back pain. AR 631. On April 4, 2007, Rosebud IHS evaluated Rogers for back spasms with the purpose of the visit being "chronic low back pain" and "scoliosis of lower thoracic spine." AR 629. Although there are only a few physical therapy records contained in the Administrative Record and no chiropractic records whatsoever, the Rosebud IHS nevertheless stated "she's been to PT many times & to the chiropractor in Winner." AR 629. Rogers returned to Rosebud IHS for low back treatment on April 13, 2007. AR 626.

After Rogers moved to Pierre, her back condition became more troubling to her. Rogers initially used Rural Healthcare, Inc., d/b/a Oahe Valley Health Center in Pierre as her primary care provider and treated primarily with Physicians Assistant Julia Abraham (PA Abraham). On May 3, 2010, Rogers visited PA Abraham for heart palpitations, hip pain and foot pain. AR 403–04. Rogers's hip pain was worse on the left and was shooting down her legs. AR 403. PA Abraham's

6

notes indicate that Rogers reported that she had been dealing with this hip pain condition "for a number of years and in the past [had] done an EMG study which did show an abnormality in nerve conduction and was diagnosed as sciatica." AR 403. PA Abraham noted "the chronic nature of her lower back pain and previous treatment" and ordered an MRI. AR 402.

The MRI of Rogers's back, done on May 11, 2010, at St. Mary's Healthcare Center, revealed "mild disc degenerative changes of the lumbar spine," no significant spinal canal stenosis at any level, S2-3 left Tarlov cyst,[6] and "mild facet arthropathy throughout the lumbar spine." AR 570. The MRI findings included a small broad based disc bulge and a finding consistent with an annular tear[7] at L1-2, a mild broad based disc bulge and a small posterior annular disc tear at L2-3, a mild broad based disc bulge with a small posterior annular disc tear at L4-5, and a mild broad based disc bulge and a small posterior disc annular tear at L5-S1. AR 570. A handwritten note on the MRI report noted degenerative disc disease, but that Rogers remained "very symptomatic," justifying a consultation. AR 570.

On May 13, 2010, Oahe Valley Healthcare Center referred Rogers to a neurosurgeon for an evaluation of back pain. AR 402. On May 27, 2010, Dr. Robert Ingraham, a Rapid City

---

[6]Tarlov cysts "typically cause no symptoms and are found incidentally on [MRI] studies done for other reasons; in the rare event they do cause back pain, they can be successfully treated in a variety of ways from corticosteroids injections to draining the cyst surgically." John Atkinson, M.D., Diseases and Conditions: Back Pain, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/back-pain/expert-answers/tarlov-cysts/faq-20058086 (last visited Sept. 29, 2014).

[7]"With trauma or, more commonly, degeneration, the outer annular layers of the disc may tear (Annular Tear) and expose the nerves," which can produce pain. "If the annular tear is large enough, the disc may extrude or herniate through the tear, resulting in a disc herniation or extrusion. . . . Provided that there is no significant disc herniation, annular tears are usually treated conservatively." Everett G. Robert, Jr., MD, Annular Tear, Spinal Res. Found., http://www.spinerf.org/learn/conditions/annular-tear (last visited Sept. 29, 2014)

7

neurosurgeon, evaluated Rogers. Rogers presented with back pain, primarily in the right low back with pain down the right leg and hip, although some pain on the left side as well. AR 510. Rogers told Dr. Ingraham that the back symptoms began in about 2005, and that sometimes the pain increased becoming of a shooting nature. AR 510. Rogers had experienced no bowel or bladder incontinence. AR 510. Rogers stated that the leg and back pain were worse with standing for long periods of time and with any lifting or bending. AR 510. Rogers said that she lost sleep at times, but has not been missing any work. AR 510. Rogers reported never having been to a chiropractor, but having been in physical therapy in 2006 when the symptoms originally started which provided some temporary relief at that time. AR 510. Rogers stated that she had long-standing neck pain as well and that she felt "like both hands on occasion are weak" affecting her fine motor skills. AR 510. Rogers described her symptoms as worsening at the time. AR 510. As recorded throughout the medical records and by Dr. Ingraham in this instance, Rogers remained a cigarette smoker and had been smoking for many years. AR 511.

Dr. Ingraham's physical examination of Rogers revealed diffuse tenderness in her cervical spine, with no obvious deformity and only mildly decreased range of motion. AR 513. Rogers had no tenderness or obvious deformity in her thoracic spine. AR 513. The physical examination of her lumbar spine showed tenderness in both sacroiliac joints and bilateral greater trochanters, without obvious deformity. AR 513. Rogers had decreased range of motion of her lumbar spine. AR 513. Rogers's lower extremities, however, had full range of motion without evidence of obvious instability. AR 514.

Dr. Ingraham ordered lateral lumbar spine films, which appeared normal. AR 514. Dr. Ingraham interpreted the MRI, apparently the one done previously that month, as showing some

8

degenerative disc disease and commented that an annular tear "may have some inflammatory products affecting the S1 nerve root, but there is no impingement seen at S1 or at L4-5 for that matter." AR 514. Dr. Ingraham diagnosed back pain and leg pain, as well as possible carpal tunnel syndrome. AR 515. Dr. Ingraham ordered a nerve conduction study as a result, sent Rogers for an epidural steroid injection, and anticipated seeing Rogers after her nerve conduction study. AR 515.

Rogers underwent an epidural steroid injection on June 23, 2010, at Black Hills Surgical Hospital to treat the back pain and radicular pain and the annular tears at L4-5 and L5-S1. AR 521–522. On the same day, Rogers underwent an electrodiagnostic study at Neurology Associates in Rapid City. AR 517–519. On June 29, 2010, Rogers returned to PA Abraham at Oahe Valley Health Center, primarily because of anxiety in wanting to know her test results from the nerve conduction study. AR 399. PA Abraham noted "otherwise [Rogers] is doing okay but continues to have the back pain regardless of the previous injection" and talked with Rogers at length about smoking cessation. AR 399.

Rogers had her follow-up appointment with Dr. Ingraham on September 24, 2010. AR 523. Dr. Ingraham recorded that the epidural steroid injection "did not help." AR 523. Dr. Ingraham described the electrodiagnostic study as showing "a mild carpal tunnel bilaterally." AR 523. Dr. Ingraham's decision for how to treat the mild carpal tunnel syndrome was: "She has some braces that she has worn for this in the past. I told her to wear those again." AR 523. Dr. Ingraham's physical findings regarding Rogers's back were "unchanged," and his assessment was of "degenerative disc disease and mild carpal tunnel bilaterally." AR 523. In addition to directing the wearing of splints for her carpal tunnel as part of the plan, Dr. Ingraham concluded: "For her low back pain, unfortunately we do not have anything to offer. She does not want to try any non-operative therapy.

9

She said she has been through it all and it is just not working. Unfortunately, I do not see anything surgical that would help her." AR 523.

Prior to that September 24, 2010, visit to Dr. Ingraham, Rogers and PA Abraham had discussed an "unemployment form" that Rogers wanted to be completed. AR 392. On August 27, 2010, PA Abraham had talked with Dr. Ingraham's office about an unemployment form for Rogers. AR 392. Dr. Ingraham's office wanted to see Rogers back before filling out such a form. AR 392. PA Abraham encouraged Rogers to take the paper with her to the appointment with Dr. Ingraham, AR 392, but it is unclear whether Rogers did so on September 24, 2010. AR 523.

However, it is clear that on September 29, 2010, Rogers called to Dr. Ingraham's office "asking to talk to Dr. Ingraham about being put on disability." AR 524. A physicians assistant to Dr. Ingraham talked with Rogers and memorialized events as follows:

> I had asked her if she thought she needed some time off of work and then she stated that she just started a new job[8] and doubted that they would give her time off of work. She wanted to know if we could help her get on disability. I reviewed her visit with Dr. Ingraham and did not feel that this would be a possibility through our office. I advised her that she should check with her primary care provider and/or possibly check with a rheumatologist because she has multiple joint pain type complaints. Dr. Ingraham did not see anything surgical and did want her to be seen by the Rehab Doctors, but she has not done this. She has not had any real conservative treatment either from a chiropractor or physical therapist. I reminded Margaret of these things and stated that she should go online and see what was required to receive social security disability since this is what she wants.

AR 524.

_____

[8]Rogers in fact had just started a job at Loopy's Dollar Store at this time. AR 51, 276–78.

Rogers also had been experiencing difficulty sleeping. On October 6, 2010, she underwent a nocturnal polysomnogram at St. Mary's Healthcare Center at the request of PA Abraham and Dr. Anthony Hericks. AR 385. The impression from the nocturnal polysomnogram included "excessive daytime somnolence, most probably secondary to underlying obstructive sleep apnea. The patient is to use caution while driving and operating heavy equipment until her sleep apnea is well controlled." AR 385. Rogers was diagnosed with obstructive sleep apnea, severe, and significant nocturnal hypoxemia. AR 385–86; AR 441–42. Rogers was prescribed a CPAP[9] to assist her in sleep. AR 385, 441. It was at this point in November of 2010 that Rogers filed the initial application for SSI and SSDI based on low back pain and sleep apnea.

According to a pulmonary followup with Dr. Hericks on January 21, 2011, the CPAP, when used, was effective in reducing Rogers's sleep apnea. Dr. Hericks confirmed Rogers's diagnosis of severe obstructive sleep apnea and excessive daytime somnolence, but added in the diagnosis obesity and tobacco dependence. AR 440. Dr. Hericks recommended continued use of the CPAP. AR 438–40. Rogers indeed felt more energy when using the CPAP. AR 65. Rogers, however, discontinued use of the CPAP later in 2011, because she was not able to financially afford to keep the machine. AR 65. In briefing, Rogers stated that she lost Medicaid coverage on May 1, 2011. Doc. 15 at 16.

---

[9]CPAP, or continuous positive airway pressure, therapy uses a machine that "supplies a constant and steady air pressure" to the patient's airway through a hose and a mask that the patient wears while sleeping. Diseases and Conditions: Sleep Apnea, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/sleep-apnea/in-depth/cpap/art-20044164 (last visited Sept. 29, 2014).

11

On April 26, 2011, Rogers returned to PA Abraham for persistent low back pain radiating down her legs. AR 444. PA Abraham recorded the following under the plan section of her progress notes:

> I did give Margaret a number of options today. She could follow up with Dr. [Ingraham] as previously directed; however, she refused this due to cost as she no longer qualifies for Medicaid. We discussed the options of being more conservative and continuing anti-inflammatories and initiating physical therapy. She is willing to let us schedule her for this but hesitant that she will follow through with it because of cost, once again. In addition, I offered her a consult with Dr. Westbrook, pain management. She is willing to set this up [but] states that she is reluctant to go, again due to cost. I did let her know if at any point things would worsen, she would develop loss of bowel or bladder function or other concerning or associated symptoms[,] she is to return to medical care. Otherwise, at this point she seems willing to move forward with physical therapy and if this is ineffective we will move forward with a consult with Dr. Westbrook. I did let her know if she would have any other question or problem arise[,] she could feel free to contact me.

AR 444. There is nothing in the Administrative Record to suggest that Rogers did either physical therapy or consulted with Dr. Ingraham or Dr. Westbrook in the aftermath of this April of 2011 visit.

In the Spring of 2011, Rogers injured her right knee.[10] AR 477–81. On March 2, 2011, Rogers presented to the St. Mary's Healthcare Center emergency room with a right knee injury. AR 477–81. Rogers had been doing laundry, twisted her right knee, heard a pop, and fell. AR 477. The clinical impression was "derangement" of the right knee. AR 478. An x-ray of Rogers's knee showed joint spaces fairly well maintained, with no large effusion, fracture, or dislocation identified.

---

[10]An old emergency room record from Rosebud IHS from March of 2001 documented that Rogers previously had injured her right knee when she slammed it against a bed while moving a mattress, AR 651, but nothing in the medical records suggest that the right knee had been restricting Rogers's ability to engage in substantial gainful activity in the decade thereafter.

AR 481. Rogers was prescribed Vicodin, instructed to recheck with her primary care provider, and released with instructions on the rest, ice, compress, and elevate protocol. AR 482.

On March 14, 2011, Rogers saw PA Abraham for right knee pain. AR 451. PA Abraham ordered an MRI and a venous doppler to rule out deep venous thrombosis. AR 451. Although there was no deep venous thrombosis, AR 483, the MRI revealed quite a number of issues with Rogers's right knee, including a contusion from a transient patellar dislocation, a patellar tracking abnormality, a full thickness cartilage defect, moderate chondromalacia near the patellar apex, sprain of the quadriceps and patellar tendons, a moderate-sized joint effusion, and a medial collateral ligament sprain. AR 484–85.

Rogers then saw Dr. Stout at Avera Medical Group Pierre on March 28, 2011, for right knee pain. Rogers reported that her right knee remained painful, although the pain was reduced. Rogers reported that her knee felt weak as if it wanted to "give out." AR 508. Dr. Stout's exam found "a little bit of swelling in the knee," but otherwise an examination suggesting that the injury was in the healing process. AR 509. Dr. Stout discussed with Rogers her options. Rogers was not interested in a cortisone injection, because she thought that the knee was healing and wanted to see how it progressed, an approach Dr. Stout agreed was reasonable. AR 509. Dr. Stout discussed the alternative of arthroscopic surgery and left it for Rogers to determine the next step of treatment. AR 509.

There is not much more in the medical records on file concerning Rogers's treatment for the right knee issue. On January 18, 2012, about ten and a half months after the initial injury, Rogers told a physicians assistant at Pierre Urban Indian Clinic that "her back, right hip, right knee and neck pain [are] getting worse." AR 535. Rogers at that time had pain upon full flexion and medial

13

palpation of the right knee, but had minimal swelling, no joint effusion, a stable joint, and no crepitus or popping with the range of motion. AR 536.

In March of 2011, Dr. Kimberlee Terry, a state non-treating agency physician, conducted a medical records review of Rogers's case. AR 106–25. Dr. Terry determined that Rogers had severe impairments for "disorders of back—discogenic and degenerative" and "sleep-related breathing disorders." AR 111. According to Dr. Terry, Rogers had limitations, where she could occasionally lift and carry twenty pounds, could frequently lift and carry ten pounds, and could stand or walk with normal breaks of about six hours in an eight-hour workday. AR 112. Dr. Terry believed that Rogers had no pushing or pulling limitations or any manipulative limitations, but that she did have postural limitations and a sitting limitation of six hours in an eight-hour work day. AR 112. Dr. Terry thought that Rogers could occasionally climb stairs and ladders, could stoop frequently, and could kneel or crouch or crawl occasionally. AR 112. Dr. Terry believed Rogers's report of walking only fifteen minutes and lifting only ten pounds to be out of proportion with the objective exams. AR 113. Dr. Terry seemed to be lacking many of the records now in the Administrative Record when conducting her records review. AR 108–10. Dr. Terry concluded that Rogers had the physical residual functional capacity to do light-duty work and was not disabled. AR 114.

After receiving Dr. Terry's report, the Commissioner denied Rogers's claim. AR 150–53. Rogers filed for reconsideration. AR 154–62. The Commissioner then submitted materials on Rogers's case to state agency non-examining physician Kevin Whittle. Dr. Whittle produced a disability determination explanation on June 18, 2011. AR 126–49. Dr. Whittle had additional material to review beyond what Dr. Terry had, including some third-party statements from Rogers's mother and Rogers's friend and information concerning Rogers's right knee injury. AR 129–31.

14

Like Dr. Terry before him, however, Dr. Whittle appeared not to have the report of the MRI[11] of Rogers's low back to review. AR 134. Dr. Whittle determined that Rogers had three severe medically determined impairments—"osteoarthrosis and allied disorders," "sleep-related breathing disorders," and "disorders of muscle, ligament and fascia." AR 132. Dr. Whittle determined that Rogers had non-severe impairments for "spine disorders" and "obesity." AR 132. It is unclear where Dr. Whittle slotted the low back condition, although it probably is under "osteoarthrosis and allied disorders," rather than under the non-severe "spine disorders." Dr. Whittle determined that Rogers had exertional limitations where she only occasionally could lift or carry twenty pounds, but could frequently lift or carry ten pounds. AR 133. Dr. Whittle found Rogers's abilities to be more limited than had Dr. Terry, in concluding that Rogers could stand and/or walk (with normal breaks) for a total of two hours and could sit (with normal breaks) for a total of six hours in an eight-hour work day. AR 133; see AR 112–13. Dr. Whittle concluded that Rogers could only occasionally climb stairs, climb ladders, stoop, kneel, crouch, or crawl. AR 133–34. Dr. Whittle concluded that Rogers's reported limits of walking only fifteen minutes at a time and lifting only ten pounds were "out of proportion" to the objective examinations, but found her statements to be "partially credible." AR 134. Dr. Whittle believed Rogers to be capable of sedentary work and deemed her not disabled. AR 136.

Due to cost concerns and her financial limitations, Rogers, a member of the Rosebud Sioux Indian Tribe, chose in 2011 to use Pierre Urban Indian Clinic as her primary care provider. AR 70, 525–47. On October 18, 2011, Rogers presented as a new patient to certified nurse practitioner

---

[11]Dr. Whittle indicated that an MRI had been ordered but the results were not in the file. AR 134.

Kathy Hettinger (CNP Hettinger) for several conditions. Because she was a new patient, CNP Hettinger explored Rogers's medical history, including recording that Rogers had a lot of back pain due to degenerative disc and joint issues. CNP Hettinger noted that Rogers had sleep apnea, but was unable to afford a CPAP machine. AR 547.[12]

In late 2011 and early 2012, Rogers sought treatment at Pierre Urban Indian Clinic for conditions unrelated to this case. AR 538–47. In this time frame Rogers was diagnosed with a hernia and had plans for hernia surgery in February of 2012. On January 18, 2012, Rogers went back to visit CNP Hettinger because her back, right hip, right knee, and neck pain were getting worse. AR 535. Rogers explained that being on her feet and walking as a part of her job caused the joint areas in her back to worsen. AR 535. Rogers had functional range of motion of her neck but limited range of motion with pain in her low back. AR 536.[13] CNP Hettinger suggested that Rogers see a chiropractor for the neck and back conditions, but Rogers responded that she could not afford that. AR 537. CNP Hettinger suggested ice and heat with stretches and exercises at home. According to CNP Hettinger's notes, Rogers "stated if she is going to have to also do other alternative things for her pain along with her pain med, she will not sign anything. She just perfer [sic] to take the med, because she claims she is not capable of doing anything else." AR 537. CNP

---

[12]Hettinger also recorded "fractured tailbone-'08," as information Rogers gave as her history. AR 547. Rogers and third parties supporting her claim refer to Rogers having a fractured tailbone. There is nothing in the medical records indicating that Rogers ever fractured her tailbone, and the x-rays and MRI of the low back seem to disprove any fracture of the tailbone. Rogers does not have a medical background and may be innocently misstating her condition as a fractured tailbone. The third parties likely understood from Rogers that she had a fractured tailbone, without knowing any different.

[13]Rogers's report and the assessment concerning her right knee from this visit were recorded previously in this Opinion and Order.

16

Hettinger offered a pain management program as an alternative, but Rogers said she could not afford that either. AR 537. CNP Hettinger advised that because Rogers is Native American, the fitness center would be free for her use and that she could walk on a treadmill and use a bike. CNP Hettinger also offered the dietician for counseling on a healthy diet, which Rogers refused because she knew what to eat to be healthy. AR 537.

On February 10, 2012, Rogers presented at the emergency room of St. Mary's Healthcare Center for acute low back pain. AR 580–83. Rogers was treated and released, prescribed Toradol, and instructed to follow up with her regular physician for pain management. AR 580–83. There are no records of any such follow-up care in the Administrative Record.

Rogers had hernia surgery on February 29, 2012. AR 525. On March 14, 2012, Rogers visited CNP Hettinger. AR 525–27. Rogers asked CNP Hettinger to fill out a "workability form for her to return to work following her ventral hernia repair." AR 525. Rogers reported that in general she was doing well. AR 525. CNP Hettinger filled out the workability form and faxed it to the South Dakota Department of Labor placing lifting restrictions on Rogers until after April 11, 2012. AR 527.

## C. Personal Function Reports

Rogers had filled out a function report initially on December 14, 2010. AR 267–74. Rogers described that she got up at 6:30 a.m., got her daughter to school, did laundry two times a week, did some light cleaning, fixed dinner around 4:00 or 5:00 p.m., did dishes, watched television and went to bed by about 11:00 p.m. AR 267. Rogers was caring for her teenage daughter at the time and was doing "everything for her." AR 268. Rogers reported that it hurt to stand on a chair to hang curtains or pictures, to do heavy cleaning, and to lay one way too long. AR 268. Rogers disclosed using a

17

shower chair when in pain and had simplified her hairstyle due to back pain. AR 268. Rogers drove

a car, but did not travel out of town because it hurt to sit too long. AR 270–72. Rogers reported that

she could lift no more than ten pounds and could walk for no longer than fifteen minutes at that time,

AR 272, but was completing the form when on medical leave due to a recent surgery, AR 274.

Others submitted function reports on behalf of Rogers in May of 2011. Rogers's mother,

Sharyn Austin, reported that she helped Rogers with chores once a month. Austin wrote that Rogers

got out of bed with difficulty, was on pain medication, and used a shower chair. AR 292. Austin

listed a number of limitations that Rogers had. AR 293. According to Austin, Rogers was able to

do laundry, vacuum, and do the dishes. AR 294.

Rogers's friend, Melodie Filler, completed a function report as well. AR 304–20. Filler had

known Rogers for two years and worked with Rogers on Sundays. AR 304. Filler wrote that Rogers

woke up early but remained tired. AR 304. Filler observed that Rogers did things slowly and was

in pain, which caused Rogers frustration. AR 310.

Later, in February 2012, Josephine Westman completed a third-party disability form in a

different format than what others had used. AR 490–500. Westman is the cousin of Rogers and

temporarily lived with Rogers. AR 492. When living with Rogers, Westman helped with household

tasks. AR 493. While Westman was living with Rogers, Rogers was working six-hour shifts at

Loopy's Dollar Store. AR 498–99. Westman listed Rogers's impairments as including a hernia, as

well as degeneration of the muscles, spine, hip and leg, and sleep apnea. AR 490. Westman

observed that Rogers could sit only in thirty-five minute increments. AR 491. According to

Westman, Rogers could not climb stairs, fatigued easily, and was not using the CPAP machine

because she could not afford it. AR 492.

18

### III.    ADMINISTRATIVE HEARING AND ALJ DECISION

ALJ Maxwell conducted a hearing on April 12, 2012. AR 46–105. Rogers testified at length during the hearing. AR 50–96. Rogers testified that she presently lives alone in an apartment in Pierre and pretty much lived independently. AR 50–51, 77. Her daughter had lived with her until March of 2011, and then her cousin Josephine Westman lived there from October of 2011 until March of 2012. AR 50–51. Rogers testified about her work experience, duties and limitations, as set forth earlier in this Opinion and Order. AR 52–62. Rogers at the time of the hearing had applied for either part-time or full-time employment at casinos and gas stations in Pierre without receiving a job offer. AR 62–63.

Rogers testified about having fatigue, which she attributed to her pain and her sleep apnea. AR 64, 83. Rogers was not on any sleep medication and felt tired all of the time. AR 66. Rogers acknowledged feeling more energetic when using the CPAP machine, but had not used the CPAP machine for a number of months because she could not afford to keep it. AR 65.

She understood her back condition to be "two slipped discs" and a "broken tailbone."[14] AR 68. She also understood that she had arthritis in her back, causing pain when she sat too long. AR 69. Rogers was taking no prescription medication for her back condition at the time of the hearing. AR 70. Rogers explained her refusal to sign the pain management contract as related to her inability to afford pain medication. AR 69. Rogers believed herself to be on a physician-imposed restriction not to lift over fifteen pounds, per Dr. Ingraham.[15] AR 71. Rogers testified about her right knee

---

[14]Annular tears and bulging discs are sometimes called "slipped discs" colloquially, but as explained in footnote 12, Rogers did not have a broken tailbone.

[15]Dr. Ingraham's records are devoid of any mention of lifting restrictions however. AR 510–24.

19

condition, saying that it pops out of joint to cause her to fall. AR 73. Rogers was not seeing anyone for her knee problem and used no device to assist her in walking. AR 72. Rogers wore a right knee brace when her knee did not feel right, but did not wear the brace at times when it felt fine. AR 84. Rogers used a shower chair primarily because of her knee issue. AR 94. Rogers acknowledged filing for unemployment compensation with the State of South Dakota after Loopy's Dollar Store closed and certifying her ability to work at that time. AR 76.

Rogers can drive, but only for forty-five minutes at a time. AR 79. Rogers knew that she was supposed to be walking more, but said that she could not walk through a large grocery store and had limitations in walking. AR 81. Rogers felt greater pain as the day goes on and would lay down during the course of the day to rest. AR 86–87. However, if Rogers sat too long, she experienced right leg tingling and numbness. AR 90.

Rogers had not been treated for her bilateral carpal tunnel issue since 2010, AR 64, but testified that she had problems with dropping things, AR 92. Rogers struggled to put on her shoes and pants, generally wore shoes with velcro ties, and had difficulty putting her hair in a ponytail. AR 93. Rogers found it hard to do dishes and too hard to stoop and put things in her oven. AR 95.

Rogers's counsel introduced at the hearing two of the people who had submitted function reports on behalf of Rogers. AR 95–96. Rogers's counsel told the ALJ that they were available if the ALJ wanted to ask them anything. AR 95–96. The ALJ had no questions for those who had submitted the personal functional reports. AR 95–96.

The ALJ then had Frank D. Samlaska testify as a qualified rehabilitation consultant. AR 97–103, 179–80. Samlaska opined that Rogers could not meet the physical demands of her past jobs. AR 99–100. Samlaska, however, testified that a person with Rogers's limitations as determined by

20

Dr. Whittle could still be a cashier/ticket taker (of which there are 1.4 million jobs nationally with 12,550 such jobs in South Dakota), a surveillance monitor (of which there are 56,000 jobs nationally with 120 such jobs in South Dakota), or a checker/cashier type (of which there are 1.4 million jobs nationally with 200 such jobs in South Dakota). AR 100. Samlaska testified that a lifting limit of ten to fifteen pounds would not prevent Rogers from doing sedentary work, such as those jobs about which he had testified. AR 102. On cross-examination, Samlaska recognized that if Rogers has handling limitations, she would be reduced from doing all the sedentary jobs he listed, other than surveillance monitoring. AR 102–03.

On June 8, 2012, the ALJ issued a decision denying Rogers's application for SSI and SSDI. AR 10–24. In doing so, the ALJ used the sequential five-step evaluation process in 20 C.F.R. §§ 404.1520(a) and 416.920(a). Under "'the familiar five-step process' to determine whether an individual is disabled," Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)), "[t]he ALJ 'consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work,'" id. (quoting Halverson, 600 F.3d at 929); see also 20 C.F.R. § 416.920 (detailing the five-step process used in evaluating claims for SSI).

At the first step, the ALJ determined that Rogers had not engaged in substantial gainful activity since July 1, 2010, because her jobs did not generate sufficient income. AR 12. At step two, the ALJ found that Rogers suffered from severe impairments of osteoarthritis and allied disorders, sleep-related disorders, and obesity. AR 13. The ALJ determined, however, that Rogers's carpal tunnel and neck and shoulder pain did not qualify as severe impairments. AR 13–14. At step three,

21

the ALJ determined that Rogers did not have an impairment or combination of impairments that met or medically equaled a listed impairment. AR 14–15. The ALJ concluded that Rogers had the residual functional capacity (RFC) to perform "seated-light exertional level work" with the following exceptions:

> [C]laimant can lift up to 20 lbs. occasionally and 10 lbs. frequently, can stand and/or walk (*with normal breaks*) for a total of 2 hours, can sit (*with normal breaks*) about 6 hours out of an 8-hour workday, and is unlimited in push and/or pull. The claimiant is able to occasionally climb ramps, stairs, ladders, ropes, and scaffolds, she can occasionally stoop, kneel[,] crouch and crawl; but is unlimited in balancing.

AR 15. Based on this RFC determination, the ALJ at step four concluded that Rogers could not perform any past relevant work. AR 22. In the fifth and final step, the ALJ considered Rogers's age, education, work experience, and RFC, as well as the testimony of the vocational expert, and determined that Rogers was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 23. Accordingly, the ALJ found that Rogers was not disabled and thus did not qualify for benefits under the Social Security Act. AR 23.

## IV.   STANDARD OF REVIEW

"When considering whether the ALJ properly denied social security benefits, we determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," id. (internal citations omitted), and such errors are reviewed de novo, id. (quoting Juszczyk v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008)).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994). "Substantial evidence is more than a mere scintilla," Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006). It is "that which a reasonable mind might accept as adequate to support the Secretary's conclusion." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). "The 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citation omitted).

A reviewing court therefore must "consider evidence that supports the Secretary's decision along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995) (citation omitted). In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the Secretary to decide, not the courts"). "If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings, [the court] must affirm the decision' of the Secretary." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because

23

substantial evidence would have supported an opposite decision." <u>Baker v. Heckler</u>, 730 F.2d 1147, 1150 (8th Cir. 1984).

## V.     DISCUSSION

Rogers argues that the ALJ's decision is not supported by substantial evidence on the record as a whole and is not free of legal error.  Rogers raises three main issues on appeal: (1) whether the ALJ failed to include and adequately describe all of Rogers's severe impairments at step two, Doc. 15 at 17; (2) whether the ALJ's credibility determinations were flawed, not supported by substantial evidence and contained errors of law, Doc. 15 at 18; and (3) whether the ALJ's residual functional capacity determination and subsequent hypothetical questions were fatally flawed, Doc. 15 at 44.

### A.     The ALJ's Assessment of Severe Impairments at Step 2

At step two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 C.F.R. §§ 404.1520(c), 416.92(c).  An impairment or combinations of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities.  <u>Id.</u>  An impairment or combination of impairments is "not severe" when medical or other evidence establishes only a slight abnormality having no more than a minimal effect on an individual's ability to work.  <u>Id.</u> §§ 404.1521, 416.921.

Rogers in her initial filing cited her chronic pain and sleep apnea as causing her disability. AR 211–17, 218–24, 258–66.  After the initial denial and her right knee injury, Rogers has argued the right knee condition as another disabling condition.  The ALJ determined that Rogers had severe

impairments of "osteoarthritis and allied disorders, sleep related disorders, and obesity."[16] AR 13. The ALJ's ruling does not elaborate on what he meant to include in "osteoarthritis and allied disorders." However, the ALJ's discussion makes clear that he did not consider Rogers's carpal tunnel syndrome, pain in her right shoulder, and repaired ventral hernia to be severe impairments. AR 13–14. The absence of a similar explanation regarding Rogers's low back and right knee conditions[17] leads to the inference that the ALJ apparently meant for the conditions to be encompassed within the severe impairment of "osteoarthritis and allied disorders." Rogers has made no argument that pain in the right shoulder or the repaired ventral hernia are severe impairments. Rogers's claim on appeal thus is limited to challenging whether carpal tunnel syndrome should have been considered a severe impairment.

At step two of the sequential evaluation process, the claimant has the burden to establish that her impairments or combination of impairments are severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007.) "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." Id. at 708. An impairment is "severe" if it "significantly limits [an individual's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities means "the abilities and aptitudes necessary to do most jobs." Id. § 404.1521(b). These abilities and aptitudes include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "capacities for seeing, hearing, and speaking;"

---

[16]Rogers never argued and no place in the medical record is it found, that obesity is a severe impairment for Rogers.

[17]The Commissioner argues that the right knee condition is not a severe impairment because it did not last for a year's time. Doc. 16 at 16, 19. The ALJ made no such finding, the MRI of the knee indicates some acute and some chronic issues, and the ALJ appears to have included it in "osteoarthritis and allied disorders."

"understanding, carrying out, and remembering simple instructions;" "us[ing] judgement;" "responding appropriately to supervision, coworkers, and usual work situations;" "and dealing with changes in a routine work setting." 20 C.F.R. 404.1521(b)(1)–(6). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)).

Mindful of the "substantial evidence in the record as a whole" standard, this Court cannot conclude that the ALJ erred at step two by not including carpal tunnel syndrome as a severe impairment. Dr. Ingraham, who suspected carpal tunnel syndrome and ordered the test, concluded that Rogers had "mild carpal tunnel bilaterally." AR 523. Dr. Ingraham, in 2010, encouraged her to wear braces for the carpal tunnel, which Rogers evidently already had. AR 523. Rogers has not been treated for the carpal tunnel syndrome since 2010, AR 64, despite having access to free healthcare at Pierre Urban Indian Clinic and treating at Oahe Valley Health Center as well in 2011. See AR 444–76, 525–49. Rogers continued to work for approximately thirty hours per week for a year and a half after that diagnosis, although she did report a tendency to drop things more frequently and difficulty with the price gun after using it for forty-five minutes without a break. AR 51, 53, 92. Both Dr. Terry and Dr. Whittle appeared to have the records from Black Hills Neurology concerning the carpal tunnel syndrome and neither included it as a severe impairment in their reports. AR 106–25, 126–49. Rogers at no point in her claim or administrative appeals prior to this federal case

26

cites carpal tunnel as a disabling condition. Rogers's testimony to the ALJ focused on her low back pain and restrictions, her right knee and her fatigue from sleep apnea, AR 50–95, and only touched briefly upon carpal tunnel issues, AR 53, 64, 92. Thus, there was substantial evidence in the record as a whole for the ALJ to conclude that carpal tunnel syndrome was not a severe impairment.

Moreover, the ALJ did not stop at step two, but adjudged Rogers to have severe impairments. The effect of Rogers's carpal tunnel condition, therefore, matters more to the calculation of her RFC in the step five analysis.

## B.    The ALJ's Credibility Determination

Rogers argues that the ALJ erred in improperly evaluating her statements and testimony about her limitations, corroborated by statements from her mother, friend, cousin, and former supervisor at work. Rogers also takes issue with the ALJ's comments about her failure to follow through with treatment recommendations, absence of treating doctor statements verifying disability, lack of taking medication, and continuance of part-time employment after her claimed date of disability. AR 18–44.

When analyzing a claimant's subjective complaints of pain and limitation, an ALJ must consider the objective medical evidence, the claimant's work history, and what is known in the Eighth Circuit as the "Polaski factors," which include: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Perkins v. Astrue, 648 F.3d 892, 900 (8th Cir. 2011) (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (internal quotation marks omitted)). Although an ALJ need not explicitly discuss each Polaski factor, an ALJ who rejects subjective complaints "must make an express credibility determination

27

explaining the reasons for discrediting the complaints." Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). Although an ALJ may not disregard a claimant's subjective complaints solely because they are not fully supported by objective medical evidence, a claimant's complaints "may be discounted based on inconsistencies in the record as a whole." Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005). A district court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks v. Astrue, 687 F.3d 1086, 1091 (8th Cir. 2012) (quoting Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006)). The Eighth Circuit has cautioned against a court substituting its "opinion for that of the ALJ, who is in a better position to assess credibility." Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).

The ALJ's decision here did not cite to Polaski nor expressly discuss each of the five Polaski factors. However, the ALJ discussed four of the five Polaski factors in addressing Rogers's daily activity, Rogers's report of pain, the absence of medications taken, and the claim of functional restrictions. AR 18–20. The ALJ did not address the Polaski factor of "precipitating and aggravating factors." Polaski, 739 F.2d at 1322. However, the ALJ need not explicitly discuss each Polaski factor, so long as the ALJ makes express credibility determinations with explanation of reasons. Wagner, 499 F.3d at 851.

The ALJ did not entirely discount Rogers's statements and testimony. Rather, the ALJ began the "credibility" section of his ruling as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the Claimant's statements concerning the intensity, persistence and limiting effects

28

of these symptoms are not credible to the extent they are inconsistent
with the above residual functional capacity assessment.

AR 18. The ALJ then stated his reasons,[18] including: (1) that the medical records did not support

finding Rogers disabled because her impairments and limitations are consistent with the ALJ's

findings of her RFC; (2) that Rogers had stopped working for reasons not related to the alleged

disabling impairments; (3) that Rogers's impairments were present at approximately the same level

of severity prior to the onset date; (4) that Rogers's complaints of disabling pain were undermined

by her statement to Dr. Ingraham that she had not been missing any work; (5) that Rogers's described

daily activities of living were inconsistent with someone precluded from engaging in substantial

gainful activity and her subsequent descriptions of limited daily activity were undermined by other

evidence; (6) that Rogers had failed to follow up on some recommendations made by her treatment

providers; (7) that Rogers's medical records lacked any opinions from treating or examining

physicians that Rogers was disabled or has physician-imposed physical limitations (other than a

lifting restriction for a limited period after hernia surgery); and (8) that Rogers had made some

inconsistent statements relevant to disability. AR 18–20. Rogers's arguments largely seek to have

this Court substitute its view of the medical records, statements, and testimony for that of the ALJ,

based on what Rogers submitted in writing and through her testimony about her pain and limitations.

This Court then turns to the nine reasons given by the ALJ for discounting Rogers's

statements about the intensity, persistence, and limiting effect of her conditions. First, the ALJ in

discussing Rogers's credibility stated that the medical records did not support finding Rogers to be

disabled because her impairments and limitations are consistent with the ALJ's RFC finding. This

---

[18]The ALJ did not enumerate these reasons. This Court does so here to facilitate discussion
of the reasons in this Opinion and Order.

29

is the subject of Part V.C. of this Opinion and Order discussed below. In short, there was substantial evidence in the record as a whole to support the RFC determination.

Second, as the ALJ observed, Rogers continued to work through February of 2012 part-time, generally close to thirty hours per week, until she lost her job because the store closed. AR 52, 228, 251–57. Her supervisor's initial submission while Rogers was still employed at Loopy's Dollar Store noted some limitations, but described Rogers as being "very productive" and always able to find work to do. AR 300–03. Granted, the subsequent more detailed questionnaire from the same supervisor later described Rogers as having slowed down considerably in her work performance and having much greater limitations. AR 326–31. As late as March of 2012, Rogers sought from CNP Hettinger completion of a "workability form for her to return to work following her ventral hernia repair" and had only limited restrictions placed on her then.[19] AR 525–27. However, "[s]eeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).

Third, the ALJ's comment that the impairments were "present at approximately the same level of severity prior to the alleged onset date," AR 19, does not apply to the right knee condition. However, that observation would apply to Rogers's sleep apnea and to some extent to her chronic low back condition and bilateral carpal tunnel.

Fourth, the ALJ was justified in finding an inconsistency between Rogers's reports that she missed time from work, and what she told Dr. Ingraham about not missing any time from work. AR 52, 510–12. Indeed, Rogers's report of how much work she missed conflicted with her supervisor's

---

[19]Nothing in this Opinion and Order should be understood as criticizing Rogers for continuing to work or as discouraging SSI or SSDI applicants from seeking out and attempting to work. To the contrary, Rogers deserves credit for working even when it was hard for her to do so.

initial report that Rogers had a good attendance record at work. AR 300. The ALJ elsewhere included this fact in his discussion of Rogers's credibility. AR 19.

Fifth, there were grounds for the ALJ to deem there to be conflicting evidence about Rogers's activities of daily living. When Rogers initially filed her function report on December 14, 2010, she described a relatively active lifestyle. AR 267–74. Her subsequent reports and testimony attest to greater pain and restrictions. AR 50–95, 285–89, 317–21. The ALJ discounted these subsequent reports based on "the relativity weak medical evidence and other factors discussed." AR 19.

Sixth, the ALJ's finding that Rogers declined to follow through with suggested care or alternatives squares with information in the Administrative Record. AR 523–24, 536–37. Rogers's points to her indigency as an alternative explanation for why she did not follow through with suggestions for physical therapy or chiropractic care, additional medications, and other treatment. However, the recommendations of CNP Hettinger to Rogers did not involve much, if any, additional cost to Rogers. AR 536–37. Pierre Urban Indian Health offered Rogers use of the exercise facility free of charge, but Rogers declined. AR 537. Rogers was eligible for free medical care through Pierre Urban Indian Health and availed herself of its medical care in 2011 and 2012 for conditions such as pelvis pain, spider bite, incontinence, staph infection, and sinusitis. AR 525–47. Yet her treatment there for the conditions related to her disability claim was limited. AR 525–27, 536–39. Rogers apparently could have obtained prescription medicine at a reduced cost, but refused to sign a prescription medicine agreement. And, as the ALJ noted some of the recommendations at issue had been made in 2010 and 2011 while Rogers still had income from her employment. While she was only working part-time at or near minimum wage, which left little money for obtaining healthcare, Rogers continued to smoke. The choice of continuing a smoking habit militates against

31

a finding that a claimant cannot afford treatment. <u>Riggins v. Apfel</u>, 177 F.3d 689, 693 (8th Cir. 1999); <u>Bales v. Colvin</u>, No. CIV 13-4021-RAL, 2014 WL 1270937, at *18 (D.S.D. Mar. 26, 2014).

Seventh, the ALJ was correct that Rogers's medical record is devoid of opinions from treating or examining physicians either that Rogers was disabled or that Rogers had greater limitations than the RFC determined by the ALJ. AR 19. Of course, a treating doctor's silence on a claimant's work capacity does not by itself constitute substantial evidence supporting an ALJ's RFC determination, especially when the doctor was neither asked to express an opinion on the matter nor did so, and especially when that doctor did not discharge the claimant from treatment. <u>Symens v. Colvin</u>, No. CIV 13-3006-RAL, 2014 WL 843260, at *20 (D.S.D. Mar. 4, 2014) (citing <u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (8th Cir. 2001)). The Eighth Circuit in <u>Pate-Fires v. Astrue</u>, 564 F.3d 935 (8th Cir. 2009), discussed that when a consulting physician has never been asked to express an opinion on a claimant's ability to work, silence on the issue is not substantial evidence that the claimant was not disabled. <u>Id.</u> at 943. However, in <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 (8th Cir. 2000), the Eight Circuit stated: "We find it significant that no physician who examined [the claimant] submitted a medical conclusion that she is disabled and unable to perform any type of work." In the wake of <u>Young</u>, courts have recognized that "the lack of functional restrictions imposed by <u>any</u> of the claimant's physicians can be properly considered by the ALJ." <u>Howard v. Astrue</u>, No. 4:10 CV 1389 JCH, 2011 WL 4007936, at *7 (E.D. Mo. Sept. 8, 2011); <u>see also</u> <u>Raney v. Barnhart</u>, 396 F.3d 1007, 1011 (8th Cir. 2005) (noting physician's opinion of disability being absent from record); <u>Agan v. Astrue</u>, 922 F. Supp. 2d 730, 750 (N.D. Iowa 2013) (holding the ALJ did not err in considering lack of significant restrictions imposed on the claimant by physicians). Here, Rogers actually sought assistance from Dr. Ingraham and PA Abraham for completion of a

32

form expressing an opinion as to her ability to work in August 2010, and the record seems to show that both were hesitant to complete such a form. AR 392–93. In September, Rogers contacted Dr. Ingraham's office seeking assistance being put on "disability," but Dave Webb, a Certified Physician's Assistant, informed her that the office would not be able to help her. AR 524. In fact, the only work restrictions shown in the medical records came later (after her hernia surgery) when both Dr. Becker, as noted by the ALJ, AR 19, and CNP Hettinger released Rogers to work with only temporary lifting restrictions. AR 525, 527. Under these circumstances, it was not error for the ALJ to comment on the absence of such treating physician opinions supporting Rogers's disability claim and to use that fact in his credibility analysis along with other evidence supporting the RFC determination.

Eighth, the ALJ stated in a conclusory manner that Rogers had "made inconsistent statement(s) regarding matters relevant to the issue of disability." AR 20. The ALJ gave just one example, concerning a Vicodin prescription, AR 20, which is meager support for this conclusion. Some of the matters discussed above, however, provide better examples of inconsistent statements.

Rogers makes many arguments about why the ALJ should have given her statements and those statements from the third-party reports more credence. However, the standard that this Court must apply remains substantial evidence on the record as a whole. It is not for this Court to substitute its judgment, even if this Court would have held differently or would have applied the Polaski factors in a different manner. See Benskin, 830 F.2d at 882 (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's testimony, are primarily for the Secretary to decide, not the courts"). Although there is evidence

33

supporting Rogers's credibility and her characterizations of her limitations, substantial evidence on the record as a whole supports the ALJ's decision to discount in part Rogers's statements.

## C.     The ALJ's RFC Determination and Step Five Analysis

A claimant's RFC "is defined as the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the work place." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). "The ALJ determines a claimant's RFC based on relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Page, 484 F.3d at 1043 (8th Cir. 2007).

With regard to Rogers's RFC, the ALJ found:

> [T]he claimant has the residual functional capacity to perform seated-light exertional level work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except the claimant can lift up to 20 lbs. occasionally and 10 lbs. frequently, can stand and/or walk (with normal breaks) for total of 2 hours, can sit (with normal breaks) about 6 hours out of an 8-hour work day, and is unlimited in push and/or pull. The claimant is able to occasionally climb ramps, stairs, ladders, ropes, and scaffolds, she can occasionally stoop, kneel, crouch and crawl; but is unlimited in balancing.

AR 15 (emphasis removed). The ALJ pulled this RFC from the report of Dr. Whittle, the second non-treating state-agency physician who did a records review. AR 133–34. The ALJ accorded Dr. Whittle's opinion "great weight" finding Dr. Whittle's opinion to be "confirmed by the medical evidence of record." AR 21. Dr. Whittle's RFC was more restrictive than the RFC determination

34

of the other non-treating state-agency physician, Dr. Terry, who had previously done a records review. Compare AR 133–34, with AR 112.

Rogers argues, with good cause, that Dr. Whittle and Dr. Terry lacked certain medical records, specifically the MRI report of Rogers's low back, and did not have other medical records or reports from certain third parties in support of Rogers's limitations. However, the ALJ did have all of that information when reaching his determination of Rogers's RFC. AR 10–24.

Rogers argues that there is a dearth of support in the medical records or witness statements for the RFC, other than the non-treating physician reports of Dr. Whittle and Dr. Terry. Rogers did not undergo any functional capacities assessment or functional capacities evaluation, and no treating physician recorded information in the medical records about specific limitations that Rogers faces. However, this does not support the inference that the ALJ's RFC necessarily is wrong, particularly in light of how Rogers's medical records read. As discussed previously, Rogers sought out from Dr. Ingraham and PA Abraham in September of 2010, the completion of a form outlining her work ability, but neither felt comfortable under the circumstances completing that form. AR 392–93, 524. After Rogers underwent hernia surgery, apparently both Dr. Becker and CNP Hettinger in March of 2012, released Rogers to work, albeit with some lifting restrictions through April 11, 2012, related to the hernia surgery. AR 525–27.

Rogers also argues that the RFC does not take into account her sleep apnea. The ALJ's RFC determination relied heavily on the findings of Dr. Whittle, which expressly listed Rogers's sleep disorder as a secondary impairment. AR 121. Dr. Whittle noted that the sleep condition was relevant to his RFC recommendations. AR 123. Rogers's description of the condition's effect on her functionality was that it made her tired, AR 66, and treatment of her sleep apnea made her less

35

tired and able to get through the day easier, AR 65. The reasonable conclusion is that the fatigue caused by the sleep apnea served mostly to aggravate impairment of functionality caused by Rogers's primary impairment, osteoarthrosis and allied disorders. Therefore, despite there being no individual analysis of the effect of sleep apnea on Rogers's RFC, the RFC determination is not inconsistent with the effects of sleep apnea, and there is nothing to suggest that the condition was not taken into account in the RFC assessment.

Rogers is correct that much of the RFC does not reconcile with statements from Rogers's mother, cousin, and friend. The testimony of Rogers and the second statement from her supervisor likewise are difficult to reconcile with portions of the RFC. However, those third-party statements also are difficult to reconcile with both Rogers's initial function report, AR 267–74, indicating that she had a relatively active lifestyle, and with the first job performance questionnaire completed by her supervisor, indicating that Rogers had a good attendance record and was very productive, AR 300–03. Rogers's explanation has been that her condition deteriorated and thus the RFC did not reflect her limitations at the time of the hearing. However appealing that explanation, given how material in the record points in opposite directions concerning the functional abilities of Rogers, this Court cannot conclude that the ALJ's determination of Rogers's RFC was unsupported by substantial evidence in the records. See Siemers, 47 F.3d at 301 (stating that if it possible to draw two inconsistent positions from the evidence and one of the positions is the ALJ's findings, the court is to affirm that finding).

Rogers also challenges the ALJ's hypothetical question of the vocational expert and reliance on the vocational expert's opinions. Doc. 15 at 49–50. Samlaska, the vocational expert in this case, testified that based on the RFC assessment, Rogers could not perform her past jobs as they had been

36

described. AR 100. Samlaska testified that Rogers, based on the RFC, could perform the duties of

a cashier-ticket taker type, surveillance monitor, and checker-cashier type. AR 100. Samlaska

testified that there are significant numbers of positions nationally and in South Dakota for those

positions. AR 100–01. The ALJ questioned Samlaska about someone with permanent medical

restrictions to lift no more than fifteen pounds, or even ten pounds or less, and to avoid steps;

Samlaska responded that such limitations would not affect performance of the three occupations he

had identified. AR 102. On cross-examination, Rogers's attorney explored the impact of someone

incapable of using her hands on a repetitive basis for more than an hour, and Samlaska

acknowledged that such a restriction would eliminate both cashier positions, but not the surveillance

monitor position. AR 102.

Here there was nothing inappropriate with the ALJ's hypothetical questioning. Testimony

from a vocational expert based on a properly phrased hypothetical question constitutes substantial

evidence. Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996). Rogers takes issue with how the

hypothetical was raised, in part because Rogers disagrees with the RFC. Rogers also takes issue with

an earlier hypothetical that did not accurately describe Rogers, but the vocational expert's testimony

was favorable to Rogers in that regard. AR 99; see Doc. 15 at 50. The hypothetical questioning that

matters to the outcome was phrased properly.

37

## VI.  CONCLUSION

For the reasons explained above, it is hereby ordered that the Commissioner's decision is

affirmed.  It is further

ORDERED that Rogers's Motion for Summary Judgment, Doc. 14, is denied.

Dated September 30, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE